case number 25194. Good morning. Good morning. Ms. Decker. Please proceed. Good morning, Your Honors, and may it please the Court. Sarah Decker for the petitioner appellant, Mr. Rahim Delano Fulton. This case is about whether a federal district court can review the government's failure to provide critical, life-sustaining medical discharge planning to a man with chronic kidney disease in its custody. Here, we all agree that Mr. Fulton has a valid removal order. And he does not challenge that removal order. He challenges the government's failure to provide him with medical discharge planning. A narrow- When you say failure to provide medical discharge planning, I mean, can you be sort of precise about the relief that you want? Because, of course, the removal was delayed because Jamaica had to prepare for providing dialysis treatment. They did have a plan to give him dialysis treatment in the ice-staging areas and got an assurance from Jamaica that there'd be dialysis there. So it's not a failure to provide anything. So what is it that you want on top of what is being provided? So, Your Honor, we would disagree with the conception that Mr. Fulton has been provided with the appropriate medical discharge plan here. And this Court's decision in Charles is very instructive on this point. Medical discharge planning is so essential because when someone is in the government's custody, as Mr. Fulton is- No, I get that it's essential, but just what is the failure and what is it that you want a court to order the government to do that it hasn't done? So the failure here is that the only thing the government has provided us is assurances, which we all agree upon, that dialysis care is, quote-unquote, available in Jamaica. That's what Mr. Gray's declaration tells us. That's not enough. That's not a plan. What Mr. Fulton is asking for is a plan of some kind. Now, what that plan looks like is a factual question. Is it actually that you want the government, the United States, to reach an agreement with the government of Jamaica to, like, set a schedule for when and where all the dialysis treatments are going to occur? That's one option, Your Honor. But again, a plan can take many forms, and what's critical here is that no plan has been presented. For example, another option- All right, so let's just focus on that since that's the most obvious way to do this. I mean, that would be a court issuing an injunction against the United States to enter into negotiations with a foreign government and reach, like, an agreement on how it's going to treat somebody in their custody? Your Honor, that's what Charles instructs us is, in fact, provided. The government must provide a plan for the provision of all medication, including medical treatments, for a temporary period so as to provide Mr. Fulton with a cushion so he can seek his own medical care. Isn't there a difference between giving him, like, a 30-day supply of medication that he can carry with him as he leaves the United States and then requiring the government to enter into diplomatic negotiations with a foreign government to reach an agreement about somebody once that person is in their care? Your Honor, it's definitely true that Mr. Fulton's medical care is certainly more complex than someone who could be discharged with, for example, a bag of pills, but that doesn't mean that he's any less constitutionally entitled to that plan. It's been a year. Yes. So what has happened in the year? Have there been no efforts to come up with a plan? Have there been any discussions inside of the office? So, Your Honor, from our perspective, the government has made no progress towards obtaining this plan. On our side, we have been engaged in advocacy with ICE directly to try to find a solution to this problem, but the government has not taken any affirmative steps to address this plan. And to Your Honor's point, there has not been- But it happens that we have in the record, there are communi- Like, so, they have this plan, like, right up to the moment of turning him over to Jamaican authorities. There's gonna be dialysis treatment in the ICE staging area there, right? And then there's discussions between the United States and the Jamaican attache that they're aware that he needs the dialysis treatment and they're gonna make it available. So the only thing that they have, and, you know, in fact, the removal was delayed for them to make preparations and so on. So the only thing that's missing is, like, some kind of agreement between the two governments as to what exactly is gonna happen, right? So, Your Honor, two points to that. So the first point is that, again, the plan is not necessarily that dialysis appointments need to be scheduled in Jamaica. There may be another plan that works. For example, there is at-home dialysis kits that are available. That's another option here. The point is that the district court entirely short-circuiting. So let's say I think, and I mean, I think this is pretty well-established. So if that, it's beyond, you know, if we're talking about an injunction, it's not like within the equitable powers and there's separation of powers problems for a court to order the United States to enter into a diplomatic agreement with a foreign government. So let's say I think that remedy is not available. What is the possible remedy that would not require that kind of order? So, Your Honor. You're saying they could give him a at-home dialysis kit just to take with him into Jamaica and that would satisfy him? Yes, Your Honor. That's certainly one possibility. There are other possible paths forward. For example, Mr. Fulton is. The district court, the district court didn't get into one. No, Your Honor. The district court held that. That's correct. They couldn't even consider whether there was such a plan. The district court here did not even consider whether there was a plan. There was no factual investigation to the sufficiency of the plan. And said what the district court did is it said that there's simply no jurisdiction to even hear this claim under 1252G. And that was a mistake for two reasons, Your Honor. The first reason is that Mr. Fulton's claims are not barred by 1252G because they do not challenge the decision or action to execute his removal order. And here, this court's decision in Delgado is highly instructive. Delgado tells us that when we look to whether a claim challenges the execution of a removal order, we must look to the substance of the relief sought. And here, the substance of relief that Mr. Fulton seeks is very narrowly tailored to medical discharge planning. He is not seeking a stay of his removal. He's disavowed seeking a stay of his removal. Yes, Your Honor. The stay of removal was intended to. Why doesn't this relate to executing a removal order? I'm sorry? Why isn't this picked up within the phrase executing a removal order? You're challenging how the removal order is being executed? No, Your Honor, we're not. We're challenging the failure to provide a sufficient medical discharge plan. And importantly, that claim would remain the same for Mr. Fulton, whether he was being transferred to a different facility, whether he was being released into the United States, or whether he was being released through deportation to Jamaica, which is the case here. And that's why that relief is separate and apart from the removal order and cannot be swept up in 1252G. Your Honor, there's some appeal to that argument, right? So we think conditions of confinement within immigration detention are not barred by the jurisdictional bars because it's not something that challenges the removal order, right? Correct. And so you're talking about the conditions of his removal. But one difference between, say, the conditions of confinement and the conditions of removal is that it is possible because the removal order is issued at the end of the immigration proceedings to raise an issue about how the removal order is to be effectuated in those proceedings, right? No, Your Honor. By the time you get to those proceedings that result in a final order of removal, you can't go back and alter the conditions of confinement that occurred previously. So why shouldn't we think about it that this is something that would be raised within the administrative proceedings and then on a petition for review from a final order of removal? So, Your Honor, a few responses to that. The first is that Mr. Fulton did not and, in fact, could not raise these claims in the petition for review process. The government argues that Mr. Fulton could pursue a motion to reopen. But that's not the type of relief Mr. Fulton is seeking. A motion to reopen acts to undo a removal order. And in order to pursue a motion to reopen, Mr. Fulton would have to have a claim that he would be persecuted or tortured in Jamaica on the basis of his medical condition. That's not the case here. Mr. Fulton is not seeking permanent stay of removal in the United States. He's not seeking status. In fact, he's not eligible for any type of status in the United States. He's seeking the very discrete relief of medical discharge planning. You have to seek asylum or withholding if you want to be excused from the 90-day window and raise country conditions evidence. But if there's new evidence that wasn't considered, and if the government were right that the manner of removal is part of the order of removal, then you are kind of seeking to reopen the order of removal, right? No, Your Honor. It's kind of a metaphysical question. Maybe the manner of removal is not really part of the order of removal, and maybe it is. But if we had the premise that it was, then it wouldn't be incoherent to say that you could reopen when you get new evidence or new information about the way in which the removal is going to be affected. But Your Honor, the point is that the relief of reopening his case would be to cancel his removal order. And that's not what Mr. Fulton seeks. Mr. Fulton seeks to be removed to Jamaica. He's just asking to be done so in a way that's lawful. And that's the- Let's say he did go through the whole process, and he raised this issue before the final order of removal was issued. It could be part of the final order of removal that there's a certain way in which he's going to be removed, right? I don't believe so, Your Honor. And that's because immigration courts and removal proceedings do not entertain issues related to the manner of removal. And indeed, these claims did not even arise until Mr. Fulton had a final order of removal that was exeutable. And I think Judge Bibas's reasoning in EOHC is really instructive here. Judge Bibas is- Yeah, but that's what I was kind of referencing, right? So he says the reason you can raise challenges to conditions of confinement is because it's now or never. Right, exactly. So if you're being denied kosher food, or all food, or whatever, in immigration detention, you can't raise that in the immigration proceedings. Because by the time you get to a final order of removal, you've already been deprived of the food in detention, right? Precisely. That's why he calls it now or never. Yes. But what I was suggesting earlier is that the manner of removal is not really like that, because that doesn't happen until after the proceedings to end in a final order of removal. So it's not really now or never, because it could be raised in that proceeding. You are raising it before the purported deprivation happens. Your Honor is right that a manner of removal claim would not arise until after a final order has been issued. And that's precisely why it should not and cannot be channeled into the petition for review process. Practically speaking, the relief that Mr. Fulton is seeking is, again, not a claim to stay in the United States, not a claim for immigration relief. And that's why this case is entirely distinguishable from the line of cases the government relies upon, like Tazoo, EFL, Camarena, Rauda. Because if you look at what those petitioners were seeking, those petitioners were seeking a stay of removal pending the adjudication of immigration relief, including a motion to reopen. You're right. So in those cases, they thought that because they could seek other immigration relief, they were entitled to delay the removal, which is more of a direct challenge to effectuating a removal order than you're saying that you're making. Correct. And in fact, Your view is you could remove me immediately as long as you give me an at-home dialysis kit. Exactly, Your Honor. That's exactly why this case is distinguishable. The relief that So but then, can I just talk about whether that relief is available? So you're bringing a habeas claim, right? The normal remedy that's available in habeas is release. But you're emphasizing you're not asking for release, right? You want, actually, the release to happen just as you want to be removed to Jamaica, just like the government wants to remove you to Jamaica. You just like to be sent there either with a kit in your pocket, or an agreement with the Jamaican government, or something else, right? That's not a bad release, right? So that's not something that would be available in habeas. Your Honor, we disagree. And we believe that it would be available in habeas because deportation is a form of release. And so what Mr. Fulton seeks here is simple release in conformance with that.  about how you're not challenging the deportation. He's not challenging the deportation. Your relief is not that you want to be released to Jamaica. The government wants to release you to Jamaica. You want to be released to Jamaica. That's not what the case is about, right? The case is about something else, which is you want some other separate assurances that occur at the same time as the release, but it's not about the release, right? It is about the release, Your Honor. It's also about the conditions related to the manner of his removal. And that's what makes medical discharge planning very uniquely situated in the law. Because as Charles tells us, medical discharge planning necessarily must occur in custody. But of course, in this case, it's related to the manner of removal, just as in other cases that may be related to the manner of someone's release. Discharge planning is an essential part of custodial release in all settings, including in the criminal setting, including even from a domestic hospital setting or a mental health facility. It's something that's essential. And here, what Mr. Fulton speaks is access to that medical discharge planning. And that can occur without disturbing the removal order whatsoever. I'm not sure that. But even if that sort of medical discharge planning, if I don't think that's really an aspect of release, I mean, you do kind of suggest at one point that maybe there's injunctive relief available. Like, you could see an equitable injunction perspectively against the government, right? Yes, Your Honor. And in fact, we also have. I was mentioning earlier about limitations on what you could get with an injunction. So if I'm skeptical that a court can enjoin the United States to negotiate with the foreign governments, what kind of relief do you think would be available in equity that would satisfy your claim? It's this at-home dialysis kit thing? Your Honor, again, the issue here is that the district court did not even do any of the factual investigation pertinent to determining whether or not the plan in place is sufficient. You can affirm based on anything in the record. So even if I think the district court may or may not have been right about the jurisdictional bars, if I think the relief you're seeking is just simply not available, that would be an alternative ground for affirming the judgment, right? So I'm asking why, if I think it's not available to order the United States to negotiate with the foreign government, what relief would you be seeking that would be available that's consistent with the limitations of equity and the separation of powers? So, Your Honor, just one point before I answer that factual question. We do also have claims under the Administrative Procedure Act. So I'd like to make that clear that in addition to our habeas claims, we do also have claims under the APA here to enforce the government's own standards. But that's sort of the same thing, right? So even if you're seeking, and there, I get it. You could even say it's not habeas, it's like mandamus. I just want the DHS to comply with its own internal guidelines or whatever. I don't know if the internal guidelines are enforceable in that way, but I don't think that's a claim. But even then, the guideline says that somebody who's being removed is going to normally get a 30-day supply of medication or a medical treatment. So the straightforward case is you put them on a plane with a bottle of pills in his pocket for 30 days. But if the way you can comply with that requires you to negotiate with a foreign government and get a kind of diplomatic agreement, it seems to me that that would limit still what a court could order, even if it's ordering compliance with that regulation. So it just goes back to my question as to whether is there a way to satisfy the claim you're seeking without ordering the United States to engage in diplomatic affairs, basically. So, Your Honor, I don't believe that asking the government in the United States to cooperate and work with the Jamaican Health Ministry as they did in order to produce the Gray Declaration to ensure that there are scheduled dialysis appointments would infringe on foreign affairs. But there are many other ways that this case could be solved.  I mean, actually, in this record, we know that there already has been talks between the United States and the government of Jamaica. There was talks with the attache and so on. There were assurances given. If the United States thinks that, given their relationship with foreign governments, they can't, like, force them to commit to, like, a particular schedule or whatever, because that would implicate other concerns about our relations with foreign governments, it doesn't seem like courts should get involved with that. So I get your argument that maybe they can, but fine. But let's just accept the premise that I think that they can't. What relief could you be seeking that would not require us to order the executive branch to engage in foreign relations? So there's two other forms of relief here that are possible. The first is that the government produces, again, a discharge plan that's sufficient that includes the medication and medical treatment that Mr. Fulton is requesting without engaging in diplomatic affairs. So how that would work, there's two possibilities here. So one would be, again, that at-home dialysis kit, which we understand is one option. The second option is that Mr. Fulton actually recently became aware that he has a loved one who's going to be a live kidney donor. So the government could, for example, facilitate Mr. Fulton's access to a kidney, which would eliminate his reliance on dialysis treatment to survive. And then, of course, the third. Before removing him to Jamaica, they have to have a whole kidney transplant? Does that happen in the United States or in Jamaica? That could happen in the United States, Your Honor. I mean, that would be a pretty substantial delay, right? It may produce a substantial delay. But again, it's an option if the government does not feel that they are able. Organizing kidney transplant in America is what is required because you think the assurances from the government of Jamaica are too vague? There are no assurances from the government of Jamaica. The only thing that the government of Jamaica has told us is that dialysis treatment is available, which is not in dispute here. And ultimately, Ms. Decker, as I understand it, your argument is that the district court did not consider any of these issues because it determined that it had no jurisdiction. Precisely, Your Honor. And you would assign legal, you would have us assign legal error to that determination. Yes, Your Honor, that's correct. So there's no record, so to speak, on any of this? No, there is no factual record on this, Your Honor. In terms of the claims, right? So the reason why the government would have to provide that relief, you're saying there's a substantive due process right? Yes. And the APA, the internal regulation. And a procedural due process right. Well, the procedural due process right, you're saying that the right is his right to life and it could be deprived. But that's not right. Like the right that you're trying to protect is the entitlement to the treatment, right? Yes, Your Honor, that's correct. OK, well put aside the procedural due process right. So to do a substantive due process claim, you have to say that the government is deliberately indifferent. If the government has this whole plan to provide him dialysis treatments, even when he's in Jamaica and the ice staging area and so on, like it is making a lot of accommodations to take care of his medical needs. Like how is it possible to conclude that the government is being deliberately indifferent to his meds? Even if they could do something more, like they're not being indifferent to his needs, right? Your Honor, two responses to that. First, again, we dispute that there is a plan in place. There is no plan in place. That's our position. The second argument is that the dangers to Mr. Fulton if he misses even one dialysis appointment are not hypothetical. In fact, they're very well known to the government. In March 2024, during a regular ice transfer... He said he needs dialysis treatment. He's getting it while he's in the United States. And I mean, you're saying there's no plan, but the record says they're making arrangements so that he could get dialysis treatments in the staging area when he arrives, right? That's not what the record says. And in fact, Mr. Gray's declaration in itself contained an error in Mr. Fulton's discharge plan. If you look to the Gray declaration, it discusses the setup of appointments that was made during his initial removal that was pursued before the beginning of this case. And you'll see that the time that he was transferred, he was being taken out of the Buffalo Federal Detention Facility at noon that day. He had a regularly scheduled dialysis appointment at 3 p.m. at ECMC that he missed. Thank you very much. So why don't we hear from the government? Yes. Thank you, Your Honor. Good morning. Good morning. May it please the court, Jonathan Robbins here on behalf of the respondents. The court should affirm the district court's dismissal of the petitioner's habeas petition under Title VIII U.S.C. Section 1252G. Under the plain language of that statute, no court has jurisdiction to review any cause or claim arising from the government, among other things, the government's decision or action to execute a removal order. And that is precisely what we have in this case. The government exercised its discretion to execute Mr. Fulton's removal. They're not challenging removal. It's the absence of a plan for medical treatment. Yes, Your Honor. But in substance, what the petitioners are doing is the government has- Let me go back to my practical question, which is it's been a year. Has there been any effort made to- it sounds like they're not contesting removal. If there were a plan, he would go. And it seems to me, why isn't- is there a plan? Have there been discussions? Why can't something be worked out here? Well, the government- Have there been efforts to come up with a plan? Petitioner spoke about their personal efforts with ICE to sort of work something out. I don't know what the details of that have been. But there's nothing- I don't know that there's been anything beyond what the government has done here. The affidavit from the deportation officer indicates that they had arranged for the dialysis to occur at the staging area before he's removed to Jamaica. Right, so I was thinking- That was all before. Yes. And what I'm inquiring about is, have there been efforts since then, in the last 12 months, to try and work something out so that it would be acceptable to both sides? I don't know of any discussion with ICE with the- Does your office not get involved in trying to resolve these matters? Well, I don't know that ICE has discussed any further with the Jamaican Ministry of Health and Welfare. Does your office get involved in trying to resolve a pending case that's in our courts? Well, it's our view that ICE has conducted everything that is in accordance with its standards. Is this accurate, in terms of what happened? So at first, the Embassy of Jamaica said it needed to delay Fulton's deportation until it secured approval from the Jamaican Ministry of Health and Wellness. So then the United States delayed. Then the Embassy of Jamaica confirmed that dialysis treatment would be available, and it would issue a travel document for him. Then the ICE Health Service Corps and the Jamaican Ministry of Health and Wellness approved his removal to Jamaica. Then you started the process of removal and told Fulton that before removal, he'd receive a medical care summary and a medical transfer summary, and that he'd go on a charter flight to Jamaica and receive dialysis treatment at the ICE staging area before and after the transfer. Is that right? That's correct. And then in addition to that, there's the assurance with the security attache at the Embassy of Jamaica who says that dialysis treatment would be available for Fulton in Jamaica. That's correct. And it's the government's position that they're not. That is the plan, right? Yes, and particularly with the medical care summary that he's intended to receive, that the officer said that he would receive before he's transferred. And the government's view is that is sufficient to satisfy our obligation under these standards. This claim that the government isn't following the performance-based national dissension standards, those are not any laws or regulations. Those are just guidance, agency guidance that's basically implemented through operating manuals. They're not binding on the agency. But regardless, all it says is you need to make arrangements for a 30-day supply of medication or medical treatment. I assume you're saying, well, he's going to get medical treatment as long as he's in our custody, and then we get assurances from the government into whose custody we're delivering him that they're going to provide the medical treatment, and that's all we can do. Yes. So your position is not just that it's not enforceable, but that also you're complying with it. Right. I mean, I think Your Honor had it right. They're basically demanding that the government engage in negotiations about details and specifics with the Dominican government. Well, that's why I asked about what relief might he be seeking that's not requiring an intergovernmental negotiation. And she said maybe give him an at-home dialysis kit. So what about that? That's the first I've heard of this. I can certainly go back to my clients and ask if that's something they're amenable to. That's also the first. Because you think he never actually asked for that? Not to my knowledge. So if you're looking at the complaint, you would think he wants the agreement with Jamaica. It wasn't what he asked for in his filings with the district court. And this is also the first time I've heard of a suggestion about organizing a kidney transplant. That was also not brought up to the district court. Now, the district court didn't consider any of this, right? That was a plan. That's correct. Because it concluded that it did not have subject matter jurisdiction. What's your argument on why it has subject matter jurisdiction? Well, I would look directly to the plain language of 1252G. The plain language of that provision states that there is no jurisdiction to review. You think this is executing removal? Absolutely. The government exercised its discretion in this case to execute a removal order. And the crux of the petitioner's claim in substance is you can't execute this removal order. Well, I mean, so do you agree that there's jurisdiction to consider a claim challenging the conditions of confinement? Yes. The Supreme Court in Jennings, this relates to the language and statute arising from. What does it mean to say that a claim arises from a decision to execute a removal order? And yes, it is true that the Supreme Court in Jennings cautioned against taking too broad of a term of the arising from language. But I would also say that there's a caution against taking too narrow a view. So the example that the Supreme Court gave was the conditions of confinement. Yes, it doesn't make sense to zipper up conditions of confinement claim in the context of removal because that's really a claim that's wholly collateral. The claim that petitioner's making is not wholly collateral to the execution of a removal. But why is that? So if the logic, look, I mean, if there's a decision to commence removal proceedings, and as part of that, they put the alien into detention. But then they also deny the alien kosher food or something like that that he needs. So he brings a claim saying, yeah, OK, you can detain me pending removal. But you should give me food I could eat. That would be a conditions of confinement claim that wouldn't be subject to the jurisdiction of bars, right? Right, but it's not. So why does the logic work the same way here? So he's being removed. And he says, OK, you can remove me. That's fair enough. But the way in which you remove me has to account for my medical thing. Isn't that really the same as a claim to get kosher food? It's a serious medical thing. It's certainly serious, Your Honor. And the government understands the gravity of the medical situation for the petitioner. But this is different, because what he's challenging is the manner of removal. And we think that that's included in the plain language of the statute. But the manner of detention wouldn't, like, so conditions of, couldn't you make the same argument about conditions of confinement? Well, conditions of confinement, first of all, are properly broadened. Well, well. Well, I don't know. Actually, that's ambiguous. I'm not sure that they are. I mean, we said in our opinion over the summer that actually conditions of confinement are properly broad and ambiguous only insofar as the appropriate remedy is released. Right. Which is why I was asking about how the remedy here doesn't seem to be released. That's a separate question. Before we get there, I'm talking about the jurisdictional bars. Well, the Supreme Court has talked, in Reno versus AADC, when the Supreme Court was narrowing the scope of 1252G, it only narrowed the scope to actions pertaining to the specified actions in the statute, the commencing cases, adjudicating cases, and executing removal orders. But it didn't narrow it only to discretionary determinations associated with that. Right. It did talk about how these particular actions do implicate the discretion of the executive. But it didn't say that the statute was limited in some way to only discretionary determinations to do those things. The statute doesn't make any distinction between discretionary actions. It just says any decision or action. And there are other parts of the INA where the statute will refer to. I mean, is the conditions of the removal, is that the kind of thing that would be raised in the removal proceedings? No, not really. And that's the point. So if that's true, then doesn't it mean that it is something that's collateral to the removal order? If it's not something you'd normally raise in the process that culminates in the final order of removal? For conditions of confinement, yes. Oh, I'm asking about the conditions of removal. So if he's talking about the way he's going to get, how he's going to get dialysis treatment on his way to Jamaica, or what assurances there needs to be for how he's going to get it upon his arrival there. Well, I think that has to be zipped up under B-9, channeled into a petition for review. We see sort of similar. That's what I'm saying. That's why I was asking. So when the process before the IJ and the BIA culminates in a final order of removal, does the final order of removal really specify the manner of removal? It doesn't normally come up. I don't see cases where it comes up. Right, it doesn't normally come up. But it seems like, so why isn't this like a conditions of confinement claim that's kind of collateral to the whole question of how we're going to, whether we're going to remove the alien or not? Because it directly affects the government's ability to execute the removal order in a way that conditions of confinement claims don't. The purpose of this. But you agree, right? So like, the INA allows you to file a motion to reopen based on changed country conditions, right? So if there's a final order of removal that's going to send you to some country, and then it turns out that there is reason to believe that now that the person is going to be persecuted there or whatever, it might be that in order to adjudicate that claim, some court is going to issue a stay of the removal order. That will interfere with the execution of a removal order. But that's allowed, because it's a remedy that you could seek, right? The delay is kind of incidental. It's not like a challenge to the authority to, you know what? Do you get what I'm saying? I do. There's a particular issue with respect to this particular portion of the statute executing removal orders, because these manner of removal claims are necessarily going to happen after the removal order is issued, right? So there's a timing issue here, where it's, as opposed to some of these other cases. I'll grant you that. But we see that happen sometimes, for example, in cat protection claims, right? People will file a protective petition for review, even though they're not challenging the basis of their removability. But they still file to protect. I mean, it's not dispositive if you can't get judicial review, right? The Supreme Court just said in Riley that there are circumstances under which there might be a withholding only determination that there's not judicial review available. And that's the artifact of the judicial review provisions in the statute. So maybe that's not decisive. I'm sort of more focused on why the conditions of the removal are not really the same analysis as the conditions of confinement that you agree are not swept up in the jurisdictional bar. Well, the language that was used, I think, in some of the decisions was that it was wholly collateral. And our point is that when you look at what the petitioner is saying, it's not wholly collateral to the decision to execute the removal. OK, you keep saying that, but I want to be precise about it. So the reason why my claim for kosher food is wholly collateral is because I'm not calling into question the government's ability to remove me. I'm not calling into question even the government's ability to detain me. I just want to be detained in a particular manner, right? So why isn't the logic here that Fulton is not calling into question the government's authority to remove him? It just says, when he's being removed, it needs to be treated in a particular manner. Well, I think the conditions of confinement case also implicates something not implicated here, which it doesn't challenge the government's ability to execute the removal order. That's the part that's the problematic here. I mean, the petitioner went into a habeas proceeding and used it not to secure release, but to enjoin the removal. That was the substance of the claim. He doesn't want to enjoin the removal, right? Because if you responded to his claim by saying, all right, here's the dialysis kit. Now get on the plane. He wouldn't be able to, he wouldn't have any claim left, right? So like it didn't, like the substance of his claim was not, I want a delay. The delay is only incidental to the incident. Here's food, now get on the plane. I understand, but what he asked for was to enjoin the removal in this case until the government could, it wasn't exactly clear, but they said basically they wanted the government to engage in more specific details about assurances with the government of Jamaica. Something that really isn't a viable habeas claim. It's certainly not a core habeas claim. All right, so let me talk about that, right? So, okay, so we actually have sort of mixed case law on this and the circuits are kind of split as to how you raise conditions of confinement claims. But we said last summer that you only get to raise them in habeas insofar as the remedy is release. And it does seem like he's not seeking release here. It seems he's seeking the opposite. So that's true, but you know, you can get prospective injunctive relief against the government to restrain unlawful action, you know, separate from habeas. So could we understand the claim as that? Well, he filed his petition as a habeas petition. He paid the $5 fee. Okay, so let's say that I wanted to construe it as seeking a prospective, you know, equitable injunction, right? I assume you would say, okay, fine, but it's not available in equity to order the executive branch to engage in negotiations with a foreign government. And that's for two reasons. One is like historically equity wouldn't require public officials to engage in discretionary actions. And two, you know, the Supreme Court keeps talking about all these problems with having the judiciary involved in foreign affairs. Okay, so then I put the question to opposing counsel as to what relief you could get that does not require an order for the government to engage in diplomatic negotiations. And she says, well, there's things you could do before releasing him, which is give him a kit or a kidney transplant. I understand that seems pretty extreme, but like that, you know, it was something that could happen in the United States. So why is that kind of relief not available? Well, that's not. I guess you might say it's waived because you're saying she just raised it. Right, that's not what they asked for. If that had been something they asked for, maybe I would have ended up agreeing to that or something. I don't know, but that wasn't. You're saying the complaint just sort of says the relief we want is an agreement between the United States and Jamaica as to how he's gonna be treated for the 30 days after he arrives. Right, they said they wanted it into what they viewed as these standards that, which aren't binding, by the way, and they don't appear in any regulation. Right, the standards are simply implemented through guidance in a way to- Is there, Mr. Rosman, a way to resolve this? I mean, it sounds like you're saying, this is the first I've ever heard of this, is there a way to resolve this? Understanding that this is a jurisdictional issue, understanding your position, is there a way to resolve this? I mean, if it's as simple as providing an at-home dialysis kit, well, that's the first I've heard of it, so I would like to talk to my client and see if that's something they're amenable to. I don't, the petitioner has said they've been in contact with ICE and they haven't been able to reach an agreement. I don't know exactly what the details of that are. I would just urge you, after this oral argument, to see if you can resolve this. Let us know. I can talk to them. If it's as simple as that, if it's just providing an at-home kit for 30 days, maybe that's something we could look into. But I would- Well, I understand, I think we understand the jurisdictional arguments and your view that conditions of confinement are a little different from the conditions at issue here. But just practically speaking, if we can resolve, and if, as you say, it's as simple as that, then maybe it can be resolved, and we'll take it off of our plate. I'm making my problem your problem. Well, I don't want to make any representations because I don't know what the agency has to say about that, but I'll certainly look into it. And so I see that I'm way over time. Yes, you are. Thank you so much. Okay. Thank you very much for your time. Thank you for your rebuttal. Thank you, Your Honors. A few- So- Yes. Have you had discussions with ICE, but not with the Department of Justice about trying to resolve this? Yes, Your Honor, we have had discussions with ICE, and ICE, in fact, Mr. Fulton's lawyer, medical care providers at ECMC, which is his local medical providers in Buffalo, have actually requested that he be brought to an appointment to assess the possibility of this live kidney transplant, just as an example, and ICE has refused to produce him for that appointment. So- Do you have discussions with Mr. Robbins about- No, Your Honor. In my old district court days, I would have brought counsel together and knocked their heads together to work out something in a case like this. We would welcome the opportunity to negotiate with Mr. Robbins. I believe Mr. Robbins entered his appearance in this case only recently. Now, with Judge Loyer's urging, Mr. Robbins is at least gonna look into it, so you should have some discussions. Yes. In other words, instead of going back to ICE, have some discussions with Mr. Robbins. Absolutely, Your Honor. I'd also like to just address a few points that Mr. Robbins raised in his argument. The first point is that, again, the Gray Declaration, which only tells us there are general assurances, is not a plan, and I'd like to walk through what would happen- But what I said earlier about all the things that ICE is making arrangements for up until the transfer, and then the fact that there's approval from the Jamaican Ministry of Health and the attache in Jamaica and so on, that he's gonna get dialysis. Like, maybe you're saying that's not enough. Okay, fine, but that is something. They have made some kind of arrangement, right? There is certainly contact and approval for Mr. Fulton to be on the deportation flight. That does not mean that he has a medical discharge plan in place. And practically speaking, what would happen to Mr. Fulton if he- I mean, if the ICE Health Service and the Jamaican Ministry of Health have coordinated and jointly approved the transfer to Jamaica, I mean, that means that there is a plan, right? To the extent that they've coordinated, that's not clear on the record, Your Honor. There's no factual investigation to what that coordination looks like. In fact, the only information that we have is what's contained in the Gray Declaration. And the District Court, as Your Honors have mentioned, did not conduct any analysis into the sufficiency of this plan. And I think what's key here is that if Mr. Fulton were to be deported tomorrow without any additional action on part of the government, what would happen to him? He would be processed as a deportee from the United States in Jamaica. Mr. Fulton has not been to Jamaica in over 20 years. That means he's required to have a national ID. He's required to be fingerprinted and processed by the Jamaican government. Then he would have to find a medical provider and seek an appointment to actually confirm that he's able to have access to a dialysis chair in Jamaica. It is unknown to us how long that could take, but the important piece here is that we already know from what happened to Mr. Fulton in March 2024 that when he misses just one dialysis appointment, and again, Your Honors, he receives these appointments three times a week. Yeah, but hold on. I mean, now you're talking as if they're just dropping him off in Jamaica and letting him fend for himself. Well, I can tell from the record that ICE is giving him dialysis right before he gets on the plane, dialysis right after he gets on the plane. The Jamaican Ministry of Health has said, well, hold on, don't send him to us until we're ready to accept somebody who needs dialysis. And then they tell the U.S. government, like, we can make sure that dialysis is available for him. Like, it's just not true that they're just dropping him off in Jamaica. Like, I just don't, that doesn't seem like a reasonable reading of the record. Maybe you want extra assurances, and I guess that's a merits question, and maybe you could pursue that or whatever. But the description you're giving, that, like, there's just no concern at all for his treatment just doesn't seem to be defensible based on the record. So, two responses to that, Your Honor. In the Gray Declaration, what happened, again, as I was saying before my colleague's argument, he missed a dialysis appointment because of his domestic transfer in the United States to Louisiana. And when he missed that dialysis appointment during the transfer, he did have immediate life-threatening complications in the United States. That plan, quote-unquote, that the government put in place in the Gray Declaration was already a violation of its obligations under both the Constitution and ICE's own standards. And I want to be clear, ICE's standards- Well, I don't know. I mean, the Constitution requires deliberate indifference. And so if you miss an appointment because somebody makes a mistake, that's not being deliberately indifferent. If you, on purpose, just don't care, then that is deliberate indifference. I mean, that matters, right? That does matter, Your Honor. And in fact, that's our point. So like here, if the government has formulated a plan, even if you think it's inadequate, it still might not be deliberate indifference. Your Honor, we believe that on this factual record, the government's failure to put forth, again, any plan, general assurances are not a discharge plan, is deliberate indifference. And in fact, we would ask that this court find that Mr. Fulton is entitled to some kind of medical discharge plan. Now, what that plan looks like, again, is a factual question that could be- Okay, but you agree that it would resolve your claim if he had a at-home dialysis kit with him as he went to Jamaica? Yes, yes, Your Honor. And that's what you will discuss with Mr. Robbins? Yes, Your Honor. What I'll ask you to do is let us know by Friday whether you've actually started discussions and how long you'll need. Is that fair, Mr. Robbins? Yes. Is that fair, Ms. Decker? Yes, absolutely, Your Honor. We believe there are many possible factual resolutions to this problem, and we're hopeful that we can reach a resolution to this problem to ensure that Mr. Fulton doesn't die upon his release from the United States. I have great faith in both of you and your abilities. Thank you very much. We'll resolve the decision.